STATE of Wisconsin, Plaintiff-Appellant,

v.

Jeremy T. GREER, Defendant-Respondent.†

Court of Appeals

*No. 01–2591–CR. Submitted on briefs April 1, 2003.—Decided May 13, 2003.*

2003 WI App 112

(Also reported in 666 N.W.2d 518.)

† Petition to review denied 9-12-03.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *David J. Becker*, assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Donna L. Hintze*, assistant state public defender of Milwaukee.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. FINE, J. The State of Wisconsin appeals from an order suppressing Jeremy T. Greer's post-polygraph confession. The trial court held that Greer's statement, although voluntary, "improperly related back" to the polygraph examination. We reverse.[2]

## I.

¶ 2. Jeremy T. Greer was arrested on May 27, 2001, for armed robbery with the use of force and first-degree reckless injury by the use of a dangerous weapon. *See* Wis. Stat. §§ 943.32(1)(a) & (2); 940.23(1)(a); and 939.63. According to the complaint, Greer took money from Ambrose Rhodes and shot him. Rhodes identified Greer as the man who robbed and shot him.·

¶ 3. Detective Douglas Williams interviewed Greer at 8:15 p.m. on May 27, 2001. According to Williams's report, Greer told Williams that "he had nothing to do with this incident and the victim has mistaken him for someone else." (Uppercasing omitted.) Williams then asked Greer if Greer wanted to take a polygraph examination. Greer said that he did.

---

[2] The Honorable Robert Crawford presided over the hearing on Greer's motion to suppress his statements and orally granted the motion. The Honorable William D. Gardner issued the "Final Order" granting Greer's motion to suppress.

¶ 4. The next day, May 28, Detective Charles Hargrove gave Greer a polygraph examination. After the examination, Hargrove read to Greer the post-examination portion of the polygraph-examination form, which, as material here, provides:

> This examination was concluded at *3:52 pm* on the above date. I completely reaffirm in its entirety my above agreement . . . . I also understand that any questions I may be asked after this point in time, and any answers I may give to those questions, are not part of the polygraph examination.

Greer then signed the form, acknowledging its contents. Approximately one hour after the examination ended, Williams again spoke to Greer, and Greer then confessed. Greer also signed a written statement admitting his guilt.

¶ 5. Greer filed a motion to suppress his May 27 and May 28 statements, claiming that: (1) he was not told of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); (2) his statements were not voluntary; and (3) his May 28 confession was impermissibly related to the polygraph examination. The trial court ruled against Greer on the first two contentions, but, as noted, suppressed Greer's post-polygraph confession. The only issue preserved for our review is whether Greer's May 28 confession was tainted by the polygraph examination.[3]

---

[3] Greer does not contest that the police complied with their obligations under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Additionally, in his briefs before us and the Wisconsin Supreme Court, he did not contest the trial court's conclusion that his confession was voluntary. On April 2, 2003, one day after we issued our notice that this appeal would be decided on the briefs, *see* WIS. STAT. RULE 809.22, Greer filed a motion to

467

¶ 6. At a hearing on the motion, Greer further testified that, at the end of the polygraph examination, Hargrove detached him from the machine and left the room with the "paper" from the machine. Greer claimed that Hargrove returned ten to fifteen minutes later and told Greer that he was "lying." According to Greer, and as found by the trial court, Hargrove also told him that he would receive 120 years in prison, but that if Greer confessed, he would receive five years of probation.

¶ 7. Hargrove then took Greer to a different room to be interviewed by Williams. Greer admitted that there were no polygraph machines in the second room. According to Greer, Hargrove said something to Williams, but Greer could not hear what it was. Hargrove then left the room, and Williams interviewed Greer, who then confessed. Williams testified that Hargrove told him that Greer had "failed the test and was ready to tell the truth" before the interview began.[4]

¶ 8. In suppressing Greer's confession to Detective Williams, the trial court opined:

---

supplement his brief, and asserted: "Having given the case *additional thought during preparation of the oral argument for the Wisconsin Supreme Court,* counsel for Mr. Greer believes there is a strong argument to be made that the facts surrounding the polygraph examination rendered Mr. Greer's subsequent statement to police involuntary and that the trial court failed to take these facts into account when ruling on the voluntariness of the statement." (Emphasis added.) The State opposed the motion, pointing out that Greer "had ample opportunity to raise the voluntariness issue in the ordinary course of this appeal," and that supplemental briefing would, therefore, be inappropriate. We agree. Accordingly, we do not review the trial court's conclusion on either the *Miranda* or voluntariness issue. *See State v. Whitaker,* 167 Wis. 2d 247, 259 n.5, 481 N.W.2d 649, 654 n.5 (Ct. App. 1992) (issue not briefed is waived).

[4] Hargrove was on military duty and did not testify.

The key here is that Detective Hargrove told Mr. Greer that he had failed the polygraph test. The only reason for doing that, I conclude as a matter of fact, was to elicit inculpatory statements from Mr. Greer.

As a result of Detective Hargrove telling Detective Williams and Mr. Greer in a situation where the three of them were all present that Mr. Greer had failed the post-polygraph interview [sic], it specifically related back to the actual mechanical polygraph test.

## II.

¶ 9. Although the results of polygraph examinations are not admissible in criminal proceedings, *State v. Dean*, 103 Wis. 2d 228, 279, 307 N.W.2d 628, 653 (1981), persons accused of crime can take them voluntarily in an effort to lift the cloud of suspicion. Anything that a defendant says during what is considered to be part of the polygraph examination is not admissible. *State v. Schlise*, 86 Wis. 2d 26, 42–44, 271 N.W.2d 619, 627 (1978). Statements that a defendant makes after the polygraph examination is over, however, may be admissible. *State v. Johnson*, 193 Wis. 2d 382, 388, 535 N.W.2d 441, 442–443 (Ct. App. 1995). *Johnson* sets out the applicable standards:

> If the post-polygraph interview is so closely related to the mechanical portion of the polygraph examination that it is considered one event, the post-polygraph statements are inadmissible. On the other hand, post-polygraph interviews may be found to be distinct both as to time and content from the examination which precedes them, and the statements made therein admissible. This determination is made after consideration of the totality of circumstances of the individual case.

*Id.*, 193 Wis. 2d at 388–389, 535 N.W.2d at 443 (internal citations and footnote omitted). A trial court's factual findings are immune on appeal unless they are "clearly erroneous." WIS. STAT. RULE 805.17(2) (made applicable to criminal proceedings by WIS. STAT. § 972.11(1)); *Johnson*, 193 Wis. 2d at 387, 535 N.W.2d at 442. "The application of constitutional principles to the evidentiary and historical facts is a question of law that we review independently of the trial court's determinations." *Johnson*, 193 Wis. 2d at 387, 535 N.W.2d at 442.

¶ 10. The touchstone of admissibility is whether the interviews eliciting the statements are "found to be totally discrete from the examination which precedes them." *Schlise*, 86 Wis. 2d at 42, 271 N.W.2d at 626. Stated another way, statements that a defendant makes after he or she takes a polygraph examination will be suppressed if "[t]he post-mechanical interview was so closely associated with the mechanical or electronic testing, both as to time and content, that it must be considered as one event." *Id.*, 86 Wis. 2d at 43, 271 N.W.2d at 627.

¶ 11. The *Schlise* "one event" touchstone is a mosaic of many fragments, and among the factors to be considered are: the time between the end of the polygraph examination and the interview during which the defendant said something that he or she seeks to suppress; whether the defendant was still attached to the polygraph machine when he or she made the incriminating statements; whether the post-polygraph interview was in the examination room or some other place; whether the defendant was told that the polygraph examination is over; and whether, as was the case

470

in *Schlise*, the polygraph examiner interrogates the defendant making "frequent use of and reference to the charts and tracing he had just obtained." *Id.*, 86 Wis. 2d at 42–43, 271 N.W.2d at 627; *see also Johnson*, 193 Wis. 2d at 389, 535 N.W.2d at 443.

¶ 12. The core factors, however, are whether when the defendant made the statements he or she seeks to suppress "the test was over" and whether the defendant was so told. *Schlise*, 86 Wis. 2d at 42, 271 N.W.2d at 627. This is true even though *no time* may have passed between the end of the examination and the start of the post-examination interview. *Ibid.* Thus, *Schlise* referenced *McAdoo v. State*, 65 Wis. 2d 596, 223 N.W.2d 521 (1974), where the segue was almost seamless:

> A first series of tests was conducted in the morning, starting at about 10:45 a.m. A lunch break was taken and a second series of tests began about 2 p.m. At about 2:25 p.m., the defendant indicated that he wished to discontinue the test. Pursuant to this request, the testing equipment was taken off the defendant, turned off and put away, and the defendant was informed that the test was over. The defendant did not indicate that he did not wish to talk to [the polygraph examiner], who continued to question the defendant. The defendant freely answered and talked for about forty-five minutes. In the course of the conversation he admitted [his crime to the polygraph examiner].

*McAdoo*, 65 Wis. 2d at 603, 223 N.W.2d at 525. *Schlise* held it to be crucial that although "[i]n *McAdoo* the interview followed the test almost directly, . . . it appeared from the record that the test was over, the defendant was informed the test was over, and that he was freely conversing with the examiner." *Schlise*, 86

Wis. 2d at 42, 271 N.W.2d at 627. Moreover, the polygraph examiner's "frequent use of and reference to the charts and tracings he had just obtained" in *Schlise* was not condemned *in vacuo*. Rather, under the circumstances in that case, the examiner's intensive and extensive use of the polygraph results in his interrogation of Schlise was evidence that the examiner "considered the 'mechanical' test and the subsequent interview to be two parts of one unified procedure." *Id.*, 86 Wis. 2d at 43, 271 N.W.2d at 627. Indeed, the examiner in *Schlise* conceded during the trial that he looked upon his post-examination interrogation of Schlise as part of the polygraph examination itself—in his words "it's all one." *Ibid.*

¶ 13. We examine against this background the historical facts in this case, both as found by the trial court and those that are not contested. As noted, our application of these facts to the law is subject to our *de novo* review.

¶ 14. In this case it is not disputed that before he confessed to Detective Williams, Greer was told, both orally and in writing, that the polygraph test was over. It is also not disputed that before he confessed to Detective Williams, Greer was not only disconnected from the polygraph machine but was moved to a different room, which did not have any polygraph machines in it. As the trial court found, there was an hour between the end of the polygraph examination and the start of Greer's interrogation by Detective Williams. And, Detective Williams was not the polygraph examiner. As the State points out, this, too, "clearly signal[ed] that the polygraph [was] over and what is to follow is no longer part of the polygraph examination." Thus, from a purely spatial and temporal standpoint, it cannot be said here, in the words of *Schlise*, that "[t]he

post-mechanical interview was so closely associated with the mechanical or electronic testing, both as to time and content, that it must be considered as one event," *id.*, 86 Wis. 2d at 43, 271 N.W.2d at 627, *unless* the fact that Greer was told that he had failed the examination trumps the other elements. We conclude that it does not.

¶ 15. As noted, persons offer or agree to take a polygraph examination to either clear their name or remove the cloud of suspicion. For example, the defendant in *McAdoo*, although arrested "was not charged at that time because he requested that he be given a polygraph examination." *McAdoo*, 65 Wis. 2d at 602, 223 N.W.2d at 525. When time passes between the end of a polygraph examination and the start of a post-examination interview, however, and the defendant is *still* in custody and questioned about the crime, there can be only one conclusion: the defendant failed the test and is *still* a suspect. This is true irrespective of whether someone tells the defendant that he or she did not pass. To hold that reference to the polygraph results in the post-polygraph interview renders inadmissible any inculpatory statements the defendant makes in that interview ignores the reality underlying the defendant's continued custody and interrogation.

¶ 16. As long as there is both a sufficient temporal separation and a sufficient spatial demarcation between the examination and the post-examination interview, and the defendant is told that the polygraph test is over, letting the defendant know that he or she did not pass the examination, or letting the defendant so conclude, does not negate that the examination and the post-examination interview are, as phrased by *Schlise*, "totally discrete" events rather than "one event." Indeed, although *Johnson* noted in that case the officer inter-

473

rogating Johnson "did not refer to polygraph charts or tell Johnson he had failed the polygraph test to elicit inculpatory statements," *Johnson*, 193 Wis. 2d at 389, 535 N.W.2d at 443, the officer *did* question Johnson's veracity right after the polygraph test:

> Shortly thereafter, the police officer escorted Johnson to an office adjacent to the polygraph lab and questioned Johnson's truthfulness as to the incident. The officer asked Johnson if he were [*sic*] sorry for what happened. He then asked Johnson to write a letter of apology. After eliciting the letter of apology, the officer asked Johnson what happened that night, and Johnson made the inculpatory admissions.

*Id.*, 193 Wis. 2d at 386, 535 N.W.2d at 442. We reversed the trial court's exclusion in the State's case-in-chief of Johnson's inculpatory post-polygraph statements. *Id.*, 193 Wis. 2d at 385, 535 N.W.2d at 441–442.

¶ 17. In our view, a truthful comment to a suspect, either volunteered by the officer or in response to the suspect's question, does not override the other factors that we have used consistently to determine whether a defendant's post-examination statements should be suppressed. Under the facts here, Greer's post-examination interview was discrete from the polygraph test: he knew the examination was over, he was disconnected from the polygraph machine, he was escorted out of the examination room and put in another room, he acknowledged that he understood "that any questions that I may be asked after this point in time, and any answers I may give to those questions, are not part of the polygraph examination," and an hour had passed between the end of the polygraph examination

and the start of the interview. Accordingly, the trial court should not have suppressed Greer's confession.

*By the Court.*—Order reversed and cause remanded.